IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ALLAN FRIEDMAN, et al.,          :     CIVIL ACTION
                                 :     NO. 08-4959
                                 :
           Plaintiffs,           :
                                 :
        v.                       :
                                 :
ANTHONY YULA, et al.,            :
                                 :
           Defendants.           :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        January 15, 2010


I.   **BACKGROUND**

          Plaintiffs Allan and Cherie Friedman (collectively,

"Plaintiffs")[1] initiated this action against corporate Defendant

Power to the Games, Inc. ("PGI") and individual Defendants

Anthony Yula ("Yula"), Christopher Vecchione ("Vecchione"),

Steven Comer, Rayna Comer and Barry Green ("Green") (collectively

"Defendants"),[2] alleging that Defendants conspired in a scheme to

───────────────

        [1]   On September 1, 2009, pursuant to Fed. R. Civ. P. 25,
Cherie Friedman was made executrix of the estate Plaintiff Robert
Friedman, son of Plaintiff Allan Friedman, and a substitute
Plaintiff following Robert's sudden and unexpected death on June
15, 2009.  See doc. no. 49.

        [2]   The individual defendants are either shareholders,
employees and/or directors of PGI, the corporate defendant.

defraud Plaintiffs and other business owners, with the goal of acquiring Plaintiffs' vending business, in violation of RICO and various state common laws.[3] Plaintiffs seek damages in excess of $1 million for the allegedly fraudulent acts of Defendants, spanning from 2002 to the present.

In 2002, Defendant PGI was formed by the individual

---

[3]  Plaintiffs allege the following eight (8) counts:

| | |
|---|---|
| Count 1: | Violation of RICO, 18 U.S.C. §§ 1962(c) <br> - Against Defendants PGI, Yula, Vecchione, Steven Comer, and Green; |
| Count 2: | Conspiracy to violate RICO, 18 U.S.C. § 1964(c), in violation of § 1962(d) <br> - Against Defendants Yula, Vecchione, Steven and Rayna Comer, and Green; |
| Count 3: | Common law fraud - fraud in the inducement <br> - Against all Defendants; |
| Count 4: | Common law fraud <br> - Against all Defendants; |
| Count 5: | Breach of fiduciary duty <br> - Against Defendants Yula, Vecchione, Steven Comer, and Green; |
| Count 6: | Civil Conspiracy <br> - Against Yula, Vecchione, Steven and Rayna Comer, and Green; |
| Count 7: | Conversion <br> - Against all Defendants; |
| Count 8: | Unjust enrichment <br> - Against all Defendants. |

See Amended Compl.

defendants[4] for the purpose of acquiring Apple Vending ("Apple"), a profitable Philadelphia vending company.  In order to raise the capital needed to purchase Apple, Plaintiffs allegedly granted Defendant Green both the stock block and Board control to insure his financial commitment, later memorialized in the PGI Shareholder Agreement, dated September 22, 2003.  Id. Ex. A.

In January 2004, PGI formally acquired Apple with Defendant Green agreeing to act as the largest financial backer. See Amend. Compl. 8.  Shortly thereafter, PGI expanded by purchasing other vending companies and/or enlarging those vending routes.  Plaintiffs contend that PGI acquired companies by, each

---

[4]   The individual defendants have all worked in the coin-operated amusement and vending machine business throughout their careers; a professional background which led to the instant business relationship at PGI, which are as follows:

| | | |
|---|---|---|
| - | Yula: | President, CEO, Board member and shareholder of PGI<br>In charge of day-to-day affairs; |
| - | Vecchione: | Vice President, Board member and shareholder of PGI<br>In charge of sales; |
| - | Steven Comer: | CFO, director and shareholder of PGI, acting as Secretary/Treasurer<br>In charge of all financial matters; |
| - | Rayna Comer: | Steven's daughter, is Manager of PGI's "cash room"; |
| - | Green: | Board member and single largest financial investor in PGI<br>Only received a weekly salary as he was uninvolved in daily affairs. |

See Amended Compl. 9.

time, forming a new corporation as a wholly-owned subsidiary and/or affiliate company, fully owned and run by Defendants, which PGI would control through a management contract.[5]

For the past two decades, Plaintiff Allan Friedman was the sole proprietor of Delaware County Amusements ("DCA"), a business that provided coin-operated vending machines to commercial establishments. In early 2004, Defendant Vecchione approached Plaintiff Robert Friedman and proposed a merger between PGI and DCA, alleging Apple was worth $6 million of which Robert would become an equity partner.[6]  See Amend. Compl. 11.

To effectuate the acquisition, Allan Friedman transferred sole ownership of DCA to his son, Robert Friedman,[7] who then executed the merger with PGI by signing a Letter of

---

[5]    Plaintiffs aver that Defendants created new companies that had separate sets of books, records, and federal income tax returns to veil the fact that PGI was a parent corporation with full control over all subsidiaries and affiliates.  See Amended Compl. 10.

[6]    As prior competitors, DCA was the first company acquired through the expansion protocol.

[7]    According to the complaint, Plaintiff Allan Friedman transferred sole ownership of DCA to his son prior to DCA's merger with PGI.  See Pls. Amend. Compl. ¶ 66.  Defendants argue that, as a result, Allan Friedman was not proximately harmed by Defendants' alleged scheme to defraud, and therefore, does not have standing in this matter.  See, e.g., Defs.' Mot. Dismiss 32. Plaintiffs disagree and argue that Allan Friedman has suffered "significant harm" as a result of Defendants' scheme because "Allan Friedman would not have transferred ownership of DCA to his son but for the assurances and representations made by the Defendants to Allan Friedman and Robert Friedman during the courtship process."  See Pls.' Resp. 44.

-4-

Intent and a Confidentiality Agreement on August 20, 2004.  <u>See</u>
Amended Compl. Exs. B & C.

On September 1, 2004, Plaintiff Robert Friedman signed
a one-year Employment Agreement with Defendants, naming him the
sole owner and President of Del Amusement, Inc. ("DAI"), the
successor to DCA.  <u>Id.</u>  According to the Employment Agreement,
Plaintiff Robert Friedman would receive a salary of $150,000 in
exchange for performing sales, merchandising, and customer
relations functions for DAI, "as defined by PGI."[8]  Additionally,
under the Employment Agreement, Robert Friedman would receive
profit sharing interest, to be triggered at the expiration of the
Employment Agreement if Plaintiff Robert Friedman's employment
was extended.[9]  <u>Id.</u> Ex. D.

---

[8]    Defendants claim that PGI is not a party to the
Employment Agreement, but Plaintiffs aver that Defendants are
themselves PGI; all acting in a concerted fashion as evidenced by
PGI's attorney preparing the Employment Agreement.

[9]    The principal terms of the profit participation are as
follows:

(a) 5% profit participation arising from the operation of
PGI and PGI entities;

(b) an additional 5% profit participation arising form
the operation of PGI and related PGI entities, for an
aggregate of 10% of PGI and PGI entitled, to be granted
at any time after the third anniversary of Robert
Friedman's employment;

(c) the profit participation interests may be granted
through a <u>Phantom Stock Plan</u>" (emphasis added).

Plaintiffs argue that Defendants Yula, Vecchione, and

On October 14, 2004, the parties executed a Management Agreement, referenced in the Employment Agreement, giving PGI control over the essential functions of DAI's business.  Id. Ex. E.  Once the Management Agreement was executed, Defendants sold a key DCA asset, its cigarette route, cigarette machines and inventory, with no prior notice to, permission of, or compensation of Plaintiffs.  Then, in 2005, upon the expiration of the Employment Agreement, Plaintiff Robert Friedman's profit participation interest was triggered, allegedly by adoption of the Phantom Stock Plan.  Id.

From December 6, 2004, through present, Defendants have created eight (8) known companies, for the alleged purpose of acquiring other corporations.  Id. at 15.[10]  Plaintiff Robert

_____

Steven Comer explained that the 'Phantom Stock Plan' was necessary to "conceal his [Robert Friedman] association with PGI" because of Robert's former criminal conviction that would render PGI ineligible for a casino gambling license in Pennsylvania should it be sought.  See Pls.' Amend. Compl., Ex. D at 3, 14.

[10]    Plaintiffs aver the following corporations were created by Defendants to veil PGI's control, of which Robert was promised a 20% ownership interest:

- 12/6/04:      PGI Distribution, Inc.

- 6/16/05:      3 Hershey LLC
                13 Hershey Real Estate LP

- 7/5/05:       A Plus Quality Vending (to purportedly
                acquire Quality Vending Systems Inc.)

- 8/15/05:      Mister Crane (to purportedly acquire
                Jami Fun, Inc.)

Friedman was allegedly guaranteed a 5% profit interest at the end of the first-year of the Employment Agreement and 20% ownership interest in the 8 other companies. However, Plaintiffs allege that by manipulating and under-reporting DAI and PGI entities' revenues, Steven and Rayna Comer not only refused to honor Robert's 5% profit interest, but induced him to "buy in" again for an additional $140,000 in cash based on the alleged under-performance of DAI, as memorialized in the "Joinder Agreement," on September 9, 2005. Id. at Ex. G at ¶ 98. Plaintiff Allan Friedman provided $75,000 of the $140,000 for his son to "buy in," for a second time, his interest in DAI. Id. at ¶ 97.

The "Joinder Agreement" bound Plaintiff Robert Friedman to other restrictive covenants, including but not limited to a covenant not to compete. Further, the Joinder Agreement explicitly stated that Plaintiff Robert Friedman's "rights under his Employment Agreement, the Profit Participation Agreement, the Phantom Stock Agreement, and the Management Agreement, shall be

---

-        Additional acquisitions:
                    Penn Vending Company
                    L&B Vending Service
                    The Whiz

Specifically, Plaintiffs aver that Defendants encouraged Plaintiffs to use their relationship with The Whiz owner, Peter LaSorsa, who was suffering from Alzheimer's disease, to agree to sell his business to PGI, after repeated refusals. Where Mr. LaSorsa's wife negotiated for an up-front cash payment, Plaintiffs aver that Robert was never compensated for his entitled return of the initial investment plus 20% ownership interest.

subject to the arbitration provisions of Section 11 of the Shareholders Agreement." <u>See</u> Pls.' Amended Compl., Ex. G. at ¶ 2(e). Here, Plaintiffs argue that because Plaintiff Robert Friedman never actually saw a physical copy of the PGI Shareholders' Agreement, he cannot be bound by the provisions therein.

On June 28, 2007, Plaintiff Robert Friedman was allegedly wrongfully terminated from his employment at PGI.[11] Plaintiffs aver that, based on the cash nature of the vending industry, Defendants have conspired and perpetrated a large-scale scheme wherein PGI effectuates takeovers of vending businesses, creates wholly-owned subsidiaries and affiliates, skims cash off the top to falsely declare under-performing,[12] and then invokes performance-based agreements from the owner-sellers. In doing so, Plaintiffs aver that Defendants strip the sellers of "their

---

[11]    Defendants have initiated action against Plaintiff Robert Friedman in three separate suits, all in Pennsylvania, after his refusal to sign the Termination Agreement. <u>See</u> <u>Power to the Games, Inc. v. Robert Friedman, et al.</u>, Bucks County CCP, Docket No. 2007-6880; <u>Power to the Games, Inc. v. Robert Friedman, et al.</u>, Philadelphia County CCP, October Term 2007, No. 00814; <u>Power to the Games, Inc. v. Robert Friedman, et al.</u>, Philadelphia County CCP, October Term 2007, No. 001204.

[12]    Plaintiffs aver that Defendants would turn over all the cash currency collecting from vending machines placed in customer locations to Rayna Comer in the "cash room", wherein she would manipulate receipts. Plaintiffs aver that the Defendants would, not only take cash from that room for their own personal use, but would use the receipts to falsify financial documents re: PGI's vending business (e.g., federal income tax returns for PGI and/or various subsidiaries). <u>Id.</u> at 24.

businesses for a small fraction of the negotiated sale price."
Id. at 20.

In September 2007, Defendant Green approached Plaintiffs and confessed to the fraudulent vending machine activity. Green and his counsel met with Plaintiffs and agreed to a collaboration on a RICO-complaint, with Green providing insider knowledge. However, Green ultimately refused to join the instant litigation as a Plaintiff once he had restored his relationship with Defendants.

On October 17, 2008, Plaintiffs Robert and Allan Friedman commenced this action and, on March 2, 2009, Defendants responded by filing motions to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or, alternatively, to stay proceedings and compel arbitration.[13]

On June 16, 2009, after the sudden death of Plaintiff Robert Friedman, the Court granted Plaintiffs' motion to substitute, Cherie A. Friedman, as executrix, pursuant to Fed. R. Civ. P. 25.

---

[13] Defendant Green has filed all pleadings independently. See Def. Green's Mot. Dismiss (basing his motion to dismiss on the argument that Plaintiffs' claims are veiled breaches of contract that should be dismissed).

## II.  ANALYSIS[14]

### A.  DEFENDANTS' MOTIONS TO DISMISS OR, IN THE ALTERNATIVE, STAY AND COMPEL ARBITRATION

####      1.  Motion to Compel Arbitration

Plaintiffs aver that, once PGI acquired Apple under the PGI Shareholders' Agreement, Defendants used the acquisition process to defraud customers by skimming cash off collected from the vending machines, claiming under-productivity, and refusing to justly compensate and/or firing the former owners.  Plaintiffs allege that only because of the proposed business deal did Plaintiff Allan Friedman consider hiring his son, Robert, to work for DCA.  Further, Plaintiffs aver that the purpose of the subsequently signed Employment and Joinder Agreements was to allow both parties to continue a mutually-beneficial business

_____

[14]     As a preliminary matter, Defendants contend that Plaintiff Allan Friedman's claims should be dismissed for lack of standing.  Defendants point out that Allan Friedman was not a party to the Agreements between Robert Friedman and Defendant and, therefore, could not have suffered any RICO injury.

When considering a motion to dismiss, under Fed. R. Civ. P. 12(b)(1), that alleges a lack of standing, as here, the court must construe the complaint in favor of the nonmoving party and accept all material allegations made in the complaint as true.  See Warth v. Seldin, 422 U.S. 490 (1975).  The Court concludes that, under the allegations pleaded here, including Allan Friedman's $75,000 cash contribution to finance Robert's second "buy in" of his interest in DAI, Allan Friedman's injuries are directly attributable to the Defendant's alleged fraudulent conduct.  See Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 268 (1992). Moreover, given that the Court has federal jurisdiction over the RICO claims, it will exercise supplemental jurisdiction over the state law claims asserted against the Defendants as well.

relationship.  Plaintiffs contend that Defendants never intended to transfer equity control to Robert, in place of Allan, and instead used this merger to take control of DCA.  Id. at 12.

Defendants have moved to compel the instant dispute to arbitration.  There are, however, three agreements at play in this case:  (1) the one-year Employment Agreement (dated September 1, 2004); (2) the Joinder Agreement (dated September 9, 2005); and (3) the PGI Shareholders' Agreement (dated September 23, 2003).  All three contain arbitration provisions, either expressly or by incorporation.  The issue here is the applicability and effect of these arbitration provisions contained in the Agreements.

The Employment Agreement, the first of the agreements signed by the parties contained a broad arbitration provision, in Paragraph 19 of the contract, entitled "Dispute Resolution" required that:

> Any controversy or claim arising out of or relating to this Agreement, any alleged breach hereof, or out of any of the other documents or agreements entered into by the parties hereto in connection with the transactions contemplated hereby shall be resolved by arbitration administered by the private dispute resolution organization known as JAMS (or its successor) pursuant to its Streamlined Arbitration Rules and Procedures, then obtaining, and judgment upon the award rendered in any such arbitration proceeding may be entered in any court having jurisdiction of the matter.  If for any reason JAMS shall not be in existence or shall not accept or be willing to arbitrate such dispute under its rule, then an din such event the dispute shall be resolved by arbitration in Philadelphia, Pennsylvania, under the commercial arbitration rules of the American Arbitration

> Association. Any such arbitration shall be conducted in
> Philadelphia, Pennsylvania, and the prevailing party in
> such proceeding shall be entitled to be awarded its
> reasonable attorneys fees and costs in prosecuting or
> defending such proceeding. In no event shall the
> provisions of this Section in any way prohibit or impair
> the right of any party hereunder to seek injunctive
> relief under the provisions of Section 7(d) hereof (or
> otherwise under this Agreement) in any court having
> jurisdiction.

See Pls.' Amended Compl., Ex. D. at ¶¶ 74-75.

Next, upon expiration of the one-year Employment

Agreement in September 2005, the parties signed the Joinder

Agreement. The arbitration provision of the Joinder Agreement,

paragraph 2(e), provided that:

> Friedman's rights under his Employment Agreement, the
> Profit Participation Agreement, the Phantom Stock
> Agreement, and the Management Agreement, shall be subject
> to the arbitration provisions of Section 11 of the
> Shareholders Agreement, provided that the Corporation and
> the other Shareholders shall have the right to seek
> equitable and/or injunctive relief without resorting to
> arbitration.

See Pls.' Amended Compl., Ex. G. at ¶ 2(e), dated September 9,

2005.

The Joinder Agreement explicitly incorporates the

arbitration provision of the PGI Shareholders' Agreement, section

11. The PGI Shareholders' Agreement, effective September 23,

2003, contained a broad arbitration provision:

> Except as for proceedings arising under Section 9.06 and
> Section 20 hereof, any controversy or claim arising out
> of, or relating to this Agreement, or the breach thereof,
> shall be settled by arbitration in Montgomery Count,
> Pennsylvania, in accordance with the procedures
> established by the American Arbitration Association

-12-

("AAA"), and judgment upon the award rendered may be
        entered in any court having jurisdiction thereof and
        shall be final and binding upon all of the parties
        hereto, their heirs, personal representatives, successors
        and assigns.

<u>See</u> Pls.' Amended Compl., Ex. A. § 11.

Plaintiffs argue that because Plaintiff Allan Friedman
was fraudulently induced to enter into the business relationship,
and resulting contractual obligations with Defendants, the
arbitration clauses contained in the three agreements (the
Employment Agreement, the Joinder Agreement, and the PGI
Shareholders' Agreement, jointly referred to as the "Agreements")
are null and void.

Defendants disagree and contend that Plaintiffs are
obligated to arbitrate this dispute under the Joinder Agreement.
Defendants explain that the Employment Agreement was supplanted
by the Joinder Agreement, which provides that "any controversy"
is subject to arbitration, under § 11 of the PGI Shareholders'
Agreement.  <u>See</u> Defs.' Mot. Dismiss.  Thus, Defendants have moved
to compel arbitration.

Specifically, as to Plaintiff Robert Friedman,
Defendants argue that he, with full knowledge of the explicit
provisions, agreed to the Joinder Agreement, and is therefore,
bound to its valid arbitration clause.  Further, Defendants argue
that, as a non-signatory, Plaintiff Allan Friedman was not
proximately harmed by Defendants' alleged scheme to defraud, and

therefore, does not have standing in this matter.  See Defs.'
Mot. Dismiss.

For the Defendants to successfully compel arbitration,
they must show: (1) that the Joinder Agreement (which
incorporates by reference the arbitration provision contained in
§ 11 of the PGI Shareholders' Agreement) is valid and
enforceable; and (2) that the instant dispute falls within the
arbitration provision of § 11 of the PGI Shareholders' Agreement.
See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395,
402 (1967).

i.    Whether the Joinder Agreement is valid and
      enforceable.

By stating that the contract with Defendants is invalid
and unenforceable, Plaintiffs are stating that the Joinder
Agreement, as a whole and § 11 of the PGI Shareholders'
Agreement, which contains the arbitration provision under which
they are being compelled to arbitrate, is void because they were
defrauded into the business relationship in its entirety.[15]

---

[15]    Plaintiffs also argue that, although Plaintiff Robert
Friedman saw and signed the Joinder Agreement, § 11 of the PGI
Shareholders' Agreement is not binding because he never actually
saw a physical copy of the PGI Shareholders' Agreement, which is
the arbitration provision expressly incorporated by reference in
the Joinder Agreement.
        Two well-established principles of contract law are
relevant here.  First, "a party is bound by all of the provisions
in the written agreement that it signs as well as the provisions
that are expressly incorporated by reference into the contract.
Prof'l Sports Tickets & Tours, Inc. v. Bridgeview Bank Group,

Generally, there are two types of fraud.  "Fraud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction

_____

2001 U.S. Dist. LEXIS 14402 (E.D. Pa. Sept. 13, 2001) (citing 72 Am. Jur. 2d Statute of Frauds § 372 (1974)); see also W&S Erectors v. Metropolitan Steel Indus., 2000 U.S. Dist. LEXIS 6039, at *2 (E.D.N.Y. Apr. 27, 2000) (finding that under the FAA, an agreement to incorporate another agreement by reference which contains an arbitration clause, binds the parties to arbitrate)). Here, Plaintiffs argument that the Agreements' arbitration provisions are unenforceable is unpersuasive as the Joinder Agreement explicitly references its adoption of § 11 of the PGI Shareholders' Agreement as the applicable, and therefore binding, arbitration provision.

Second, a signatory may not claim "ignorance of the contents of a contract expressed in a written instrument" to alter the binding nature of that contract.  Id. (citing 17A Am. Jur. 2d Contracts § 224 (1991)).  Pointedly, the Third Circuit held that "it will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained."  Morales v. Sun Constructors, Inc., 541 F.3d 218, 221 (3d Cir. 2008) (citing Upton v. Tribilcock, 91 U.S. 45, 50 (1875)).  The "'integrity of contracts demands' that this principle 'be rigidly enforced by the courts.'"  Id. (citing Richard A. Lord, Williston on Contracts § 4:19 (4th ed. 2008)). Here, Plaintiff Robert Friedman, as signatory to the Joinder Agreement, cannot now disavow applicability of the arbitration provision in the PGI Shareholders' Agreement because he did not see the physical document.  As party to the Joinder Agreement, Plaintiff Robert Friedman is held accountable for knowledge of the written provisions of the Joinder Agreement and resulting obligations.

Furthermore, § 11 of the PGI Shareholders' Agreement did not alter the parties' substantive rights, instead it merely allocated the format and location of the arbitration proceedings.

For these reasons, the Court finds that Plaintiff Robert Friedman cannot have knowingly signed the Joinder Agreement, foregoing actual observation of the incorporated agreements, yet later disavow his obligations expressed therein. As such, the arbitration provision of the PGI Shareholders' Agreement is binding, even where Plaintiff Robert Friedman did not actually see a physical copy of that agreement.

and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 107 (3d Cir. 2000). On the other hand, "[f]raud in the factum occurs when a party procures a[nother] signature to an instrument without knowledge of its true nature or contents." See Langley v. FDIC, 484 U.S. 86 (1987) (citing Restatement (Second) of Contracts § 163 cmts. a, c). Fraud in the inducement merely makes a contract voidable, but fraud in the factum results in the agreement being void ab initio (i.e., it results in ineffective assent to the contract). Sandvik, 220 F.3d at 107, 109-110. A voidable contract "is capable of being affirmed or rejected at the option of one of the parties." Id. (quoting Black's Law Dictionary 1605 (8th ed. 2004)). However, a contract that is void ab initio is "null from the beginning." Black's Law Dictionary 1604 (8th ed. 2004).

In Prima Paint, the Supreme Court considered whether, under the FAA, a claim of fraud in the inducement of an entire contract was to be resolved by a federal court, or referred to arbitration, pursuant to the challenged contract's arbitration clause. 388 U.S. at 402. The Supreme Court concluded that:

> [I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider

claims of fraud in the inducement of the
contract generally.

Id. at 403-04.

Properly applied to the case at bar, "[t]he teaching of
Prima Paint is that a federal court must not remove from the
arbitrator[s] consideration of a substantive challenge to a
contract unless there has been an independent challenge to the
making of the arbitration clause itself." Large v. Conseco Fin.
Servicing Corp., 292 F.3d 49, 53 (1st Cir. 2002) (quoting
Unionmutual Stock Life Ins. Co. of Am. v. Beneficial Life Ins.
Co., 774 F.2d 524, 529 (1st Cir. 1985)); see also Giannone v.
Ayne Inst., 290 F. Supp. 2d 553, 560 (E.D. Pa. 2003) ("In short,
Prima Paint held that courts should adjudicate issues involving
fraud in the inducement of an arbitration clause, but arbitrators
should determine whether there has been fraud in the inducement
of the entire contract.").

Following Prima Paint, the Supreme Court in Buckeye
Check Cashing Inc. v. Cardegna, identified three categories of
disputes where parties challenged the contract in its entirety as
opposed to specific (e.g., arbitration) provisions of the
contract: (1) "if a challenge is specifically to the arbitration
provision, it must be decided by a court; (2) if a challenge is
to the contract as a whole, it must go to arbitration; and (3) if
a challenge is to a party's signatory power to the contract, it

must be decided by a court."[16]  546 U.S. 440, 446 (2006).

Here, the challenge is not among the first category, a direct challenge to an arbitration clause, which must be decided by the Court.  Plaintiffs' challenge does not fall within the third category either, as no argument was made that "they did not sign the contract, that the contract was signed by someone without authority, or that they lacked the capacity to sign the contract", which is also decided by the Court.  Id. (citing Buckeye, 2006 WL 386362, at *6).  Clearly, this challenge falls squarely within Buckeye's second category, a challenge to the contract as a whole and, therefore, compels submission to

---

[16]     In Buckeye, the holding in Prima Paint was revisited. There, the Supreme Court distinguished between disputes regarding the "validity of the agreement to arbitrate" and challenge to the entire contract.  Id. at 444; see also Sandvik, 220 F.3d at 99.
        The Court held that "queries concerning 'the contract as a whole, either on a ground that directly affects the entire agreement . . . or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid . . . . the parties must proceed in accordance with the arbitration provisions of the contract in question.  Id. at 449 (concluding arbitration is the appropriate forum where a contract is challenge as void ab initio); see also Prima Paint, 338 U.S. at 398 (holding that where the claim of fraudulent inducement went to the contract as a whole, the dispute was to be referred to arbitration); WS Liquidation, Inc. v. Etkin & Co., 2009 U.S. Dist. LEXIS 4353, at *7 (W.D. Pa. Jan. 22, 2009) (granting motion to compel arbitration where contract was challenge as void ab initio; Gay v. Creditinform, 511 F.3d 369, 387 (3d Cir. 2007)(upholding validity of arbitration clause despite assertion of class action claim based on statute with references to 'court').

arbitration.[17]  Id.

Here, the Joinder Agreement contains a valid, enforceable arbitration clause.  Any claim that the Joinder Agreement was fraudulently induced must be directed to the arbitrator.

ii.  Whether the instant dispute falls within the
     scope of the Joinder Agreement.

To determine whether a dispute falls within the scope of an agreement, a district court, under a presumption of arbitrability, must honor, "what appears to be most consistent with the intent of the parties," on the theory that arbitration clauses are creatures of contract and, "[a]s a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so."  PaineWebber, Inc. v.

----

[17]  In Fox Int'l Rels. v. Fiserv Secs., Inc., the court noted that an arbitration panel may determine that the contract was induced by fraud in the factum and is void.  418 F. Supp. 2d 718, 724 (E.D. Pa. 2006).  This would result in the Court having enforced an arbitration clause in a void contract; however, the court, in Fox Int'l, noted that this was expressly contemplated by the Supreme Court in Buckeye:

> It is true .... that the Prima Paint rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void.  But it is equally true that respondent's approach permits a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable.  Prima Paint resolved this conundrum - and resolved it in favor of the separate enforceability of the arbitration provisions.

Id. (internal citations omitted).

Hartmann, 921 F.2d 507, 511, 513 (3d Cir. 1990).[18]

Here, the arbitration clause of the Joinder Agreement, incorporating by reference the arbitration provision of the PGI Shareholders' Agreement, states: "Friedman's rights under his Employment Agreement, the Profit Participation Agreement, the Phantom Stock Agreement, and the Management Agreement, shall be subject to the arbitration provisions of Section 11 of the Shareholders Agreement."  See Pls.' Amended Compl. Ex. G.  The PGI Shareholders' Agreement contains a broad arbitration provision, encompassing "any controversy or claim arising out of, or relating to this Agreement, or the breach thereof, shall be settled by arbitration in Montgomery Count, Pennsylvania, in accordance with the procedures established by the American Arbitration Association ("AAA")."  See Pls.' Amended Compl. Ex. A. § 11.  Whether the Joinder Agreement has been breached, and if so, what damages or other relief Plaintiffs are entitled to falls squarely within the scope of the arbitration clause incorporated into the PGI Shareholders' Agreement.

Defendants have demonstrated that (1) the Joinder Agreement is valid and enforceable, and (2) that the instant dispute falls within the scope of the Joinder Agreement, which

---

[18]    Once a court has determined that the dispute at issue falls within the substantive scope of the parties' arbitration clause, it is barred from hearing the merits of the suit, and must refer the matter to arbitration.  Id. at 511.

contains an arbitration provision that incorporates by reference the arbitration clause in the PGI Shareholders' Agreement. Therefore, this Court will compel arbitration.[19]

<u>            2.  **Motion to Dismiss or Stay**</u>

Having compelled arbitration of Plaintiff Robert Friedman's claims, a signatory to the Agreements, this Court must now determine whether to grant Defendants' motion to stay, dismiss or, in the alternative, compel arbitration of Plaintiff Allan Friedman's claims.  Here, the issue is whether Plaintiff Allan Friedman, a non-signatory to the Agreements, may be compelled to arbitrate his claims, given that he never entered into those Agreements.

"There are five traditional theories under which a signatory can bind a non-signatory to an arbitration agreement: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel." <u>Marciano v. Mony Life Ins. Co.</u>, 470 F. Supp. 2d 518, 525 (E.D. Pa. 2007) (Robreno, J.) (citing <u>Trippe Mfg. Co. v. Niles Audio Corp.</u>, 401 F.3d 529, 532 (3d Cir. 2005)); <u>see also</u> <u>E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.</u>, 269 F.3d 187,

_____
[19]     <u>See</u> <u>In re Pharm. Benefit Managers Antitrust Litig.</u>, 582 F.3d 432, 440 (3d Cir. Pa. 2009) (upholding this Court's order to compel arbitration where it was expressly found that "the instant dispute [fell] . . . within the scope of the Arbitration Agreement" and "that there [wa]s a valid agreement to arbitrate between the parties.").

-21-

195 (3d Cir. 2001) (finding that contract theories may bind a non-signatory to an arbitration clause in a valid agreement exist, "i.e., third party beneficiary, agency/principal, and equitable estoppel."). Here, only the theory of estoppel is relevant.

Estoppel, or more fully equitable estoppel, may be found in two contexts. One, where a non-signatory "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." Dupont, 269 F.3d at 199. Two, "because of 'the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.'" Id. (quoting Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993)) (internal citations omitted).

As the Third Circuit has explained, the first theory "prevent[s] a non-signatory from embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." Id. at 200. The second theory involves claims about parent companies who have not signed agreements containing arbitration clauses entered into by related entities. Of the two theories, the former more closely describes what occurred here.

The Third Circuit's decision in <u>Dupont</u> is instructive
here.  <u>Dupont</u> involved an agreement between Dupont subsidiaries
and named defendants to undertake a fifty-year joint venture.
269 F.3d at 190.  The written agreement between the subsidiaries
and the defendants contained an arbitration clause.  Dupont, who
was not a signatory to the written agreement, claimed that it was
damaged, not as a result of any breach of the written agreement,
but rather as a result of a breach of an oral agreement by the
defendants to continue to support the joint venture and that the
defendants had induced it by material misrepresentations to
further support the venture.  The defendants moved to compel
arbitration under the written agreement, which contained an
arbitration clause.  The district court denied the motion to
compel and Dupont appealed.

The Third Circuit found that Dupont was estopped from
disavowing the arbitration clause contained in the written
agreement.  The court found that by arguing that the defendants
had breached an oral promise made to Dupont to abide by the terms
of the written agreement, Dupont's claim "can well be argued (a)
embraces the underlying Agreement and (b) requires proof that
[the defendants] ultimately breached the underlying Agreement."
<u>Id.</u> at 201.

Acknowledging that "it was a close call," the court
found equitable estoppel to apply.  As the court put it: "what is

-23-

at the core of this case is the conduct and the statements [made to induce Dupont to continue to finance the joint venture.]"  <u>Id.</u>

Similarly here, Plaintiff Allan Friedman alleges that, as a result of certain misrepresentations and oral agreements by Defendants, he transferred his interest in DCA to his son Robert Friedman.  Further, Allan claims that having done so, i.e., having performed his end of the deal, Defendants breached the agreement with Robert as well.  Thus, much like in <u>Dupont</u>, what is at issue here "is the conduct and the statements" rendered by Defendants to the non-signatory Allan Friedman.  Central to Allan's claims is the need to articulate the extent of the agreement between Robert and Defendants, the breach of that agreement and any damages stemming from that breach.  Thus, having embraced the written agreement between Robert and Defendants to prove his claims and his damages, Allan cannot now walk away from the arbitration clauses in the Agreements.

Therefore, Plaintiff Allan Friedman must be compelled to arbitration claims under the Joinder Agreement.

Finally, in addition to compelling arbitration where required by the FAA, a court has discretion to dismiss the action instead "[i]f all the claims involved in an action are arbitrable."  <u>Seus v. John Nuveen & Co., Inc.</u>, 146 F.3d 175, 179 (3d Cir. 1998) (recognizing the "functional equivalence of dismissing an action and directing parties to proceed to

arbitration) (internal citations omitted); see also Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992) (finding that 9 U.S.C. § 3 [FAA] "was not intended to limit dismissal of a case under the proper circumstances").[20]  Given that all of Plaintiff Allan Friedman's claims are arbitrable under the Joinder Agreement, the Court will exercise its discretion and will dismiss Allan's Friedman's claims without prejudice.

## III. **CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss for lack of standing is **DENIED** and motion to compel arbitration is **GRANTED.**

An appropriate order follows.

---

[20]     The Supreme Court has noted that Federal Arbitration Act "requires piecemeal litigation when necessary to give effect to an arbitration agreement." Moses H. Cone Mem. Hosp. v. Mercury Constr. Co., 460 U.S. 1, 20 (1983).  Noting that in some cases it is "advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration," Id. at 20 n.23, the Supreme Court has emphasized that the decision to stay proceedings against parties is a matter within the district court's "discretion to control its docket." Id.; see also WS Liquidation, 2009 U.S. Dist. LEXIS 4353 (citing Gay v. Creditinform, 511 F.3d 369, 392 (3d Cir. 2007) (plaintiff will, in arbitration, "retain the full range of rights created by [the statutes]").